UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

EDWIN EUGENE BENNETT, et al.,                                                    Plaintiffs,

v.                                                                 Civil Action No. 3:16-cv-169-DJH-DW

THOMAS YOUNG, et al.,                                                         Defendants.

* * * * *

## MEMORANDUM OPINION AND ORDER

On January 7, 2016, Hardinsburg, Kentucky, police officer Thomas Young arrived at Plaintiff Gene Bennett's residence with two warrants for Bennett's arrest. (Docket No. 38-6, PageID # 400) Young sought to arrest Bennett immediately, but Bennett pleaded that he needed ten minutes to find someone to watch his sick wife. (D.N. 38-5, PageID # 398) Bennett's pleas eventually turned to outright noncompliance, which resulted in Young tasing Bennett. (*Id*., PageID # 398–99) The primary question before the Court is whether Bennett's noncompliance rose to the level of "active resistance" such as to justify the use of force. Even when viewing the record in the light most favorable to Bennett, the Court finds from the undisputed facts that he was actively resisting arrest at the time he was tased, and therefore Young's use of force was reasonable. Accordingly, Bennett's excessive-force claim under the Fourth Amendment fails as a matter of law. Without an underlying constitutional violation, Bennett cannot succeed on his claims of supervisory and municipal liability. The Court will therefore grant in part Defendants' motion for summary judgment and remand Plaintiffs' remaining state-law claims to state court.

## I.    Background

Officers Thomas Young, Adam Lucas, and Brad Norwood arrived at Bennett's residence on January 7, 2016, to serve two warrants for his arrest. (D.N. 38-6, PageID # 400) At the

officers' request, Bennett walked down his driveway to speak with the officers, who remained on the public roadway. (D.N. 33, PageID # 255) Young told Bennett that he was under arrest pursuant to the outstanding warrants and that he needed to leave with them immediately. (*Id.*, PageID # 257) In light of Bennett's claim that his attorney had taken care of the warrants, Young called a dispatcher who confirmed that the warrants were still outstanding. (D.N. 36, PageID # 323) Young then informed Bennett that he now "had no choice" but to arrest him. (D.N. 35, PageID # 296)

The parties present different versions of the subsequent events. Bennett asserts that his noncompliance was due to the fact that his wife, Norma Bennett, could not be left alone given her medical condition. (D.N. 33, PageID # 255) He claims that he asked Young if he could leave with the officers in ten minutes so that he could find someone to look after Norma. (*Id.*) Young refused, allegedly saying that he did not care about Bennett's wife. (*Id.*) The back-and-forth continued, and Young eventually reached for his taser. (*Id.*) Bennett contends that upon seeing this, he explained to Young that given Bennett's defibrillator and pacemaker, Young should not tase him. (*Id.*, PageID # 256) Young again insisted that Bennett must leave with the officers immediately. (*Id.*) Bennett told Young one last time that he could not tase him, to which Young allegedly replied, "the fuck I can't." (D.N. 38-5, PageID # 399)

The officers' version of events depicts Bennett as much more aggressive. According to Defendants, upon Young's insistence that Bennett leave immediately with the officers, Bennett began barraging the officers with profanity, actively pacing around the vehicles, and refusing Young's repeated commands to leave with the officers. (D.N. 35, PageID # 297; D.N. 38-4, PageID # 396) He purportedly called the officers "sons-of-bitches" and stated that "[it would] take more than you three sons-of-bitches to take me to jail." (D.N. 33, PageID # 258, 265) The

officers further attest that Bennett's behavior took on a physical tone and that he began (i) clenching his fists (D.N. 38-6, PageID # 401); (ii) swaying his shoulders (*id.*); (iii) wringing his hands (D.N. 35, PageID # 302); (iv) swinging and twisting his arms (*id.*, PageID # 296); (v) "huffing and puffing" (*id.*); and (vi) "squaring up" and approaching Young so as to signal an eagerness to fight  (*id.*, PageID # 305).  In response to this behavior, the officers claim to have implemented several de-escalation techniques, which included Young giving Bennett a specific warning that he was going to tase him if he did not cease his aggression.  (*Id.*, PageID # 302) Although Bennett denies many of the officers' assertions, he agrees with or fails to refute several material aspects of the officers' account.

Both sides agree that after issuing a final warning to Bennett, Young deployed his taser in "probe mode' from a distance of about six feet.  (D.N. 33, PageID # 258; D.N. 35, PageID # 302)  The probes hit Bennett in the front of his torso and the front of his left arm.  (D.N. 38-7) The single taser shot lasted somewhere between five and eight seconds.  (D.N. 38-8; D.N. 33, PageID # 256)  As a result of the incident, Bennett was charged with disorderly conduct, second degree, a misdemeanor under Kentucky law.  *See* Ky. Rev. Stat. § 525.060.  (D.N. 33, PageID # 257)

Gene and Norma Bennett brought this action against Officer Young, Hardinsburg Chief of Police Mike Robinson, and the City of Hardinsburg, alleging violations of federal and state law.[1]  (D.N. 1-1)  Defendants move for summary judgment on all claims.  (D.N. 38)  Defendants also move to exclude and limit Plaintiffs' proposed expert witnesses.  (D.N. 39)

---

[1] Norma Bennett passed away on August 21, 2016.  The Court granted Edwin Bennett's motion to substitute her estate as a party in this matter.  (D.N. 21; D.N. 23)

## II.     Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the movant "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may do so by merely showing that the nonmoving party lacks evidence to support an essential element of its case for which it has the burden of proof.  *See id*.

If the moving party satisfies this burden, the nonmoving party must point to specific facts in the record demonstrating a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  To survive a motion for summary judgment, the nonmoving party must establish a genuine issue of material fact with respect to each element of each of its claims.  *Celotex Corp.*, 477 U.S. at 323 (1986) (noting that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").  The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient; instead, the nonmoving party must present evidence upon which the jury could reasonably find for it.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (citing *Anderson*, 477 U.S. at 252).  This "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  For purposes of summary judgment, the Court must view the evidence in

the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255).

**III.    Discussion**

**A. Fourth Amendment Constitutional Claim**

*1. Constitutional Violation*

Plaintiffs allege that Young "did wrongfully and with malice apply excessive force." (D.N. 1-1, PageID # 8)  Although Plaintiffs do not explicitly tie this allegation to a constitutional provision, the Court will construe the claim as an allegation of excessive force under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 394 (1989) (holding that the Fourth rather than Fourteenth Amendment governs excessive-force claims that "arise[] in the context of an arrest or investigatory stop of a free citizen").

Claims of excessive force are analyzed under a standard of reasonableness. *Graham*, 490 U.S. at 388.  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id*. (internal quotations omitted).  Courts must evaluate excessive-force claims by assuming "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  The Supreme Court has articulated three factors for courts to consider when analyzing the reasonableness of an officer's use of force: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate safety threat to the police or the public; and (3) whether the suspect is attempting to resist or evade arrest. *Id.*

When addressing claims of excessive force arising out of an officer's use of a taser, however, the Sixth Circuit Court of Appeals has occasionally collapsed the *Graham* test into a

5

more straightforward inquiry.[2]  "Cases from [the Sixth Circuit] . . . adhere to this line: If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him."  *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012).  Recently, the Sixth Circuit held that active resistance alone justifies the use of a taser.  *See Thomas v. City of Eastpointe*, No. 16–2594, 2017 WL 4461072, at *2 (6th Cir. Oct. 6, 2017) ("If the suspect was actively resisting, use of a taser to subdue him was reasonable.  If not, then tasing was unreasonable.").  The Sixth Circuit has "found active resistance where a suspect physically struggles with police, threatens or disobeys officers, or refuses to be handcuffed."  *Id.*  In defining "active resistance," the Court of Appeals has contrasted active resistance with passive resistance.  "The former can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders.  The latter is generally shown by the lack of physical resistance or verbal antagonism." *Jackson v. Washtenaw*, 678 F. App'x 302, 306 (6th Cir. 2017) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015); *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015); *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498 (6th Cir. 2012); *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013)).  Indeed, verbal hostility alone may constitute active resistance where it is "the final straw in a series of consciously-resistive acts."  *Eldridge*, 533 F. App'x at 534; *see also Kent v. Oakland Cty.*, 810 F.3d 384, 392 (6th Cir. 2016) ("[A]ctive resistance [can] be characterized as 'noncompliance' that is coupled with 'some outward manifestation—either verbal or physical—on the part of the suspect that suggests volitional and conscious defiance.'" (quoting *Eldridge*, 533 F. App'x at 534) (internal alterations omitted)).

---

[2]  Indeed, the Sixth Circuit has referred to *Graham*'s three prongs as merely "[r]elevant considerations."  *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007).

The parties dispute some facts regarding Bennett's arrest. Defendants present a version in which Bennett became alarmingly aggressive towards the officers. Bennett, on the other hand, contends that while he refused Officer Young's instructions, he told Young his reason for refusing his orders and remained relatively calm during the ordeal. But Bennett either admits or fails to refute several material aspects of Defendants' version of the event. First, at Young's insistence that Bennett must leave with the officers immediately, Bennett admits that he told the officers that the only way he was going with them was if "you three son of a bitches . . . take me," and that it would "take [the officers] longer than 15 minutes to put [him] in the [squad vehicle]." (D.N. 38-5, PageID # 399; D.N. 33, PageID # 256) Second, Bennett admits that Young told him that he was under arrest and that he instructed Bennett multiple times to leave with them immediately. (D.N. 38-5, PageID # 399; D.N. 33, PageID # 257) Third, Bennett admits that Young warned him one last time to comply with his instructions or he would tase him, and that Bennett still refused Young's requests. (D.N. 33, PageID # 262) And finally, Bennett fails to address Defendants' allegation that he told the officers to "get on their little walkie-talkies." (D.N. 35, PageID # 297)

Based on these unrefuted facts, the Court finds that Bennett actively resisted arrest prior to being tased. As previously discussed, active resistance exists where an individual refuses to comply with an officer's orders and that refusal is coupled with "some outward manifestation" that suggests conscious defiance, *Kent*, 810 F.3d at 392, such as "verbal hostility." *Jackson*, 678 F. App'x at 306. Bennett does not dispute that he refused to comply with Young's orders. (D.N. 33, PageID # 257) He also admits to an "outward manifestation" of conscious defiance (i.e., cursing at the officers and insinuating that his removal would require use of force). (D.N. 38-5, PageID # 399; D.N. 33, PageID # 256) In short, the situation presented here is not the type that

the Sixth Circuit has held presents material questions of fact as to active resistance. *See Smith v. City of Troy, Ohio*, 874 F.3d 938, 945 (6th Cir. 2017) (finding that a genuine issue of material fact existed as to whether the plaintiff's conduct of pulling his arm away from a police officer during an alleged seizure amounted to active resistance); *Gradisher v. City of Akron*, 794 F.3d 574, 586 (6th Cir. 2015) (material issue of fact existed where plaintiff claimed he told officer "you got me," officers did not warn him before using taser, and officers continued tasing him after he had been incapacitated by the initial tasing). Unlike the scenario in *Smith*, Bennett's "outward manifestation" was not a reflexive move. Similarly, unlike the plaintiff in *Gradisher*, Bennett does not allege that he ever expressed words of submission to the officers or that the officers failed to warn him before tasing him. In fact, Bennett admits that Young warned him. (D.N. 33, PageID # 262)

As explained above, the Sixth Circuit has sometimes collapsed the *Graham* three-prong inquiry for excessive-force claims arising from the use of a taser into a more straightforward inquiry. *See Thomas*, 2017 WL 4461072 at \*2. The relevant question is whether Bennett was resisting arrest, as that term has been defined by the Sixth Circuit, such that Young's use of force was reasonable.[3] *Id*. Because the Court finds that Bennett's admitted use of profanity towards the officers and insinuation that he would not leave his home without a struggle constituted "active resistance," Young's use of the taser was reasonable and Bennett's excessive-force claim fails as a matter of law. *Id*.

In sum, the undisputed facts demonstrate that Bennett actively resisted arrest before Officer Young resorted to the taser. Young's use of the taser was therefore reasonable, and Bennett's excessive-force claim fails as a matter of law. *See Thomas*, 2017 WL 4461072 at \*2.

---

[3] Thus, the fact that Bennett was not charged with resisting arrest under Kentucky law does not necessarily support his position.

*2. Qualified Immunity*

Even if Young violated Bennett's constitutional rights when he deployed his taser, qualified immunity protects Officer Young. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what [the defendant] is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal alterations and quotations omitted). Thus, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*.

The "clearly established" standard is not satisfied here. Particularly instructive is *Thomas*, in which the Sixth Circuit addressed whether an officer could tase someone reasonably perceived to be ignoring police commands, and walking away. 2017 WL 4461072 at *2. The court held that "[t]he law is not clearly established that an officer cannot tase a suspect who refuses to comply with a police officer's commands and walks away . . . . We cannot say then that every reasonable official would have understood that tasing [the plaintiff] under these circumstances would violate his Fourth Amendment rights." *Id*. at *4 (internal quotations omitted). If it is not "clearly established" that an officer cannot tase a suspect who simply refuses an officer's commands and walks away, it certainly is not "clearly established" that an officer cannot tase a suspect who curses at the officers and insinuates that he will not comply with their orders without use of force.

Indeed, the Sixth Circuit has established two lines of cases on this issue. "The first line of cases has held that there is no clearly established right not to be tased when a suspect is actively resisting arrest." *Brown v. Chapman*, 814 F.3d 447, 461 (6th Cir. 2016). "The second line of cases has held that an individual's right to be free from a taser is clearly established when the individual is not actively resisting arrest or is already detained."[4] *Id.* The dispute at issue here does not fall within the second line of cases for the simple reason that in those cases, the arrestee did not actively resist arrest. *See, e.g.*, *Thomas v. Plummer*, 489 F. App'x 116, 127 (6th Cir. 2012) (no active resistance where the arrestee had taken a kneeling position, signaling that he was surrendering); *Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. 2010) (no active resistance where the arrestee was simply sitting inside his truck talking to a 911 operator when the police dragged him out of the truck and tased him); *Landis v. Baker*, 297 F. App'x 453, 458 (6th Cir. 2008) (no active resistance where the arrestee was "unarmed, knee deep in muddy water, surrounded by at least four law enforcement officers, and was no longer trying to resist arrest").

Ultimately, Bennett simply "fails to identify any case factually similar to this one" where a police officer has been denied qualified immunity for claims related to tasing a suspect who disregards repeated commands and is verbally hostile to police. *Watson v. City of Marysville*, 518 F. App'x 390, 393 (6th Cir. Mar. 26, 2013); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) ("To demonstrate that the Officers unreasonably violated a clearly established right, the Plaintiffs must therefore show the prior articulation of a prohibition

---

[4] This is why the Court concluded above that the Sixth Circuit has sometimes collapsed the *Graham* inquiry into a straightforward analysis: Rather than analyze *Graham*'s factors, the Sixth Circuit occasionally resolves unconstitutional use-of-taser claims by simply asking whether the situation before them is more like the former or latter line of cases and thus whether qualified immunity applies. *See, e.g.*, *Thomas*, 2017 WL 4461072; *Jackson*, 678 F. App'x 302; *Rudlaff*, 791 F.3d 638.

against the type of excess force exerted here.").  It follows then that even if Bennett had stated an underlying constitutional violation, Young would be protected by qualified immunity.

**B. Negligent Hiring, Training, and Supervision**

Bennett also asserts that Defendant Mike Robinson, in his capacity as Hardinsburg Chief of Police, "failed to adequately screen and research the background of Defendant Thomas Young prior to employing him as a Police Officer." (D.N. 1-1, PageID # 8)  Bennett further claims that Robinson and the City of Hardinsburg were "grossly negligent in their hiring, training, supervision, and retention of Defendant Thomas Young." (*Id.*)

It is not clear from the face of the complaint or Bennett's response to Defendants' motion for summary judgment whether Bennett asserts these claims under federal or state law.  (*See id.*; D.N. 43)  Assuming Bennett asserts federal claims, they fail as a matter of law.  To hold a supervisor or municipality liable under these theories, there must be an underlying constitutional violation.  *See McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 471 (6th Cir. 2006).  Since the Court has found that the underlying conduct was not an unconstitutional exercise of police force, Plaintiffs' claims regarding Defendants' hiring, training, and supervision practices fail.  *See id.*  Even if Bennett had stated an underlying constitutional violation, his claims would fail as a matter of law.

*1. Hiring*

"The Supreme Court has placed a heavy burden on plaintiffs seeking to impose municipal liability as a result of hiring decisions."  *Doe v. Magoffin Cty. Fiscal Court*, 174 F. App'x 962, 967 (6th Cir. 2006) (citing *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997)).  To prevail on his claim, Bennett must prove "(1) sufficient fault in the form of 'deliberate conduct' and (2) a causal link between the alleged policy or custom and the injury."

*Id.* (quoting *Brown*, 520 U.S. at 404).  To survive Defendants' motion for summary judgment,

Bennett must establish a material question of fact as to whether knowledge of the officers'

history would "lead a reasonable policymaker to conclude that the plainly obvious consequence

of the [hiring] decision . . . would be the deprivation of a third party's federally protected right."

*Brown*, 520 U.S. at 411.  To do so, he must show that Defendants were deliberately indifferent to

the risk that the Young was "highly likely to inflict the *particular* injury suffered by [Bennett]."

*Id*. at 412.

Defendants have met their initial burden in demonstrating the absence of a material

question on this issue.  Defendants cite ample evidence that Young was an experienced and well-

trained law-enforcement officer at the time he was hired.  (*See* D.N. 35, PageID # 368; D.N. 38-

16)  In response, Bennett has presented no more than speculation.  He merely notes that "there is

no evidence whatsoever that the Department engaged in any deep investigation of Young's

background" and that "[t]here is no indication of any psychological screening or assessment in

the hiring process."  (D.N. 42, PageID # 588)  But as explained above, Bennett cannot avoid

summary judgment by simply pointing to an absence of facts in the record.  He must

affirmatively show that a material question remains as to whether knowledge of Young's history

would lead a reasonable policymaker to conclude that hiring Young would obviously lead to a

deprivation of constitutional rights and that Young was highly likely to inflict the particular

injury suffered by Bennett.  *Brown*, 520 U.S. at 411.  Bennett has not done so.[5]

---

[5] Bennett seeks to offer testimony by two expert witnesses who purportedly have information
regarding an investigation of Young and his release by a former employer.  (D.N. 32)  This
proposed testimony is irrelevant, however, as Bennett does not argue that Robinson and the City
of Hardinsburg were aware of these circumstances.  (*See* D.N. 43)  Indeed, Bennett fails to even
mention the expert witnesses or any blemish on Young's record in his response to Defendants'
motion for summary judgment.  (*See id*.)

*2. Supervision*

A § 1983 claim "must fail against a supervisory official unless the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010) (quoting *Cardinal v. Metrish*, 564 F.3d 794, 802–03 (6th Cir. 2009)). Supervisory liability "must be based on more than the right to control employees." *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). "Likewise, simple awareness of employees' misconduct does not lead to supervisory liability." *Id*. at 903 (quoting *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 728 (6th Cir.1996)).

In his response to Defendants' motion for summary judgment, Bennett has made no attempt to argue that Robinson or the City of Hardinsburg encouraged or participated in the incident at issue. (D.N. 43, PageID # 588–89) Nor would the record support such a contention: Robinson was not at the scene at the time of the tasing (*see* D.N. 38-5), and there is no evidence to indicate that either Robinson or the city encouraged Young to use his taser on Bennett. Bennett's negligent-supervision claim thus fails as a matter of law. *See Colvin*, 605 F.3d at 292.

*3. Training*

Bennett's failure-to-train claim against Robinson likewise fails. "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident or misconduct or in some other way directly participated in it." *Moniz v. Cox*, 512 F. App'x 495, 499 (6th Cir. Jan. 22, 2013) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). As already stated, Bennett has failed to show that Robinson encouraged or participated in the tasing. (D.N. 43, PageID # 588–89)

Bennett's failure-to-train claim against the city of Hardinsburg also fails. To proceed with a failure-to-train theory against the city, "[Bennett] must identify and describe the official policy or custom that resulted in a constitutional violation." *Horn v. City of Covington*, No. 14–73–DLB–CJS, 2015 WL 4042154, at *4 (E.D. Ky. July 1, 2015). And Bennett must ultimately show "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of [Defendants'] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused [Bennett's] injury." *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016) (quoting *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)). Bennett may demonstrate deliberate indifference in two ways: (1) by pointing to "prior instances of unconstitutional conduct demonstrating that [Defendants] had notice that the training was deficient and likely to cause injury but ignored it," or (2) by alleging "a single violation of federal rights, accompanied by a showing that [Defendants] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Harvey v. Campbell Cty., Tenn.*, 453 F. App'x 557, 562–63 (6th Cir. 2011). Deliberate indifference based on a single violation of rights, however, requires "a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Id*. at 567.

Bennett alleges a single instance of unconstitutional conduct. (*See* D.N. 1-1) Bennett must therefore demonstrate a complete failure on the part of the City of Hardinsburg to train its police force. Bennett argues that Hardinsburg has "no policy on the use of non-lethal force" (*see* D.N. 35, PageID # 298; D.N. 36, PageID # 321), and "no policy on de-escalation procedures" (*see* D.N. 36, PageID # 321). (D.N. 43, PageID # 588). He also claims that Hardinsburg "has

14

not updated its policy and procedures manual in nearly 20 years" (*see* D.N. 36, PageID # 321), and that there is no evidence that officers actually read the manual. (*Id.*)

As to the first and last arguments, Bennett ignores the record. At his deposition, Robinson testified that the police department maintains a policy on use of force. (D.N. 36, PageID # 321) Young testified during his deposition that he has read that policy. (D.N. 35, PageID # 298) And Assistant Chief Terry Laslie testified that he ensures each officer maintains the appropriate training certifications, which includes certification on the use of a taser. (D.N. 37, PageID # 337; D.N. 36, PageID # 322)

Bennett is correct that the department manual is nearly twenty years old. (*Id.*) Yet even if the manual is dated, Bennett fails to show that the policies constitute reckless or grossly negligent training. *See Harvey*, 453 F. App'x at 567. Indeed, Bennett titles his claim as "negligent training." (D.N. 43, PageID # 588) Bennett has failed to demonstrate—or for that matter even plead—that the manual constitutes reckless or grossly negligent training.

Finally, although Bennett correctly alleges that the police department did not have a specific policy on de-escalation procedures (D.N. 36, PageID # 321), this fact is irrelevant unless Bennett can demonstrate that Young's alleged constitutional violation was "closely related to" or "actually caused" by such a failure to train. *City of Canton*, 489 U.S. at 378, 390–91 (1989). If Bennett's testimony is taken as true, then the alleged constitutional violation was not closely related to or caused by a failure to train officers on de-escalation practices. Bennett contends that other than a few choice words, he was not aggressive towards the officers. (*See* D.N. 33) In such an instance, de-escalation policies would be irrelevant as the unconstitutional failure-to-train would stem, if at all, from the department's procedures on use of force. Moreover, the

officers contend that they employed several de-escalation techniques, and Bennett does not dispute that these techniques were employed.  (*See* D.N. 38-1, PageID # 357; D.N. 33)

Even if Bennett had stated an underlying constitutional violation, his federal claims of negligent hiring, training, and supervision would fail as a matter of law.

## C. State-Law Claims

In the absence of any remaining federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims.  Pursuant to 28 U.S.C. § 1367(c)(3), this Court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction."  In the Sixth Circuit, there is "a strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed"; the Court should retain jurisdiction "only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh [the] concern over needlessly deciding state law issues."  *Packard v. Farmers Ins. Co. of Columbus*, 423 F. App'x 580, 584 (6th Cir. 2011) (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006)).

The discretion to decline supplemental jurisdiction over state-law claims extends to all stages of litigation, including summary judgment.  *See Booker v. City of Beachwood*, 451 F. App'x 521, 523 (6th Cir. 2011) (citing *Nails v. Riggs*, 195 F. App'x 303, 313 (6th Cir. 2006)). The fact that the parties have engaged in extensive discovery does not bar this Court from declining to adjudicate state-law claims.  *See Jeung v. McKrow*, 264 F. Supp. 2d 557 (E.D. Mich. 2003); *Practice Perfect, Inc. v. Hamilton Cty. Pharm. Ass'n*, 732 F. Supp. 798 (S.D. Ohio 1989). In declining to exercise supplemental jurisdiction, the Court may either dismiss the state-law claims or remand them.  *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 761 (6th Cir. 2000).  "In

exercising that discretion, the Court may consider the convenience of the parties and expeditiousness in resolving the case." *Jeung*, 264 F. Supp. 2d at 572 (citing *Long*, 201 F.3d at 761).

Here, in light of the parties' extensive discovery, remanding Plaintiffs' state-law claims to Breckinridge County Circuit Court is appropriate.

**D. Evidentiary Motion**

Finally, Defendants move to exclude and limit several of Plaintiffs' proposed expert witnesses. (D.N. 39) Because the proposed expert testimony would not change the Court's resolution of Defendants' motion for summary judgment, the Court will deny the motion as moot.

## IV. Conclusion

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)    Defendants' motion for summary judgment (D.N. 38) is **GRANTED** in part. Plaintiff's federal claims are **DISMISSED** with prejudice.

(2)    Plaintiffs' state-law claims are **REMANDED** to Breckinridge County Circuit Court in accordance with 28 U.S.C. § 1367(c)(3).

(3)    Defendants' motion to exclude and limit Plaintiffs' proposed expert witnesses (D.N. 39) is **DENIED** as moot.

(4)    A separate judgment will be entered on this date.

March 30, 2018

**David J. Hale, Judge**
**United States District Court**